UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TABITHA PEARL RICKS                          CIVIL ACTION

VERSUS                                       NO. 18-9767

FRIENDS OF WWOZ, INC. ET AL.                 MAGISTRATE JUDGE
                                             JOSEPH C. WILKINSON, JR.

## <u>ORDER AND REASONS ON MOTIONS</u>

This is an employment discrimination action brought by Tabitha Pearl Ricks against her former employer, Friends of WWOZ, Inc. ("Friends"); Beau Royster, Friends's Chief Financial Officer ("Royster"); and Beth Utterback, Friends's General Manager ("Utterback"). Ricks asserted claims of employment discrimination and retaliation based on race, gender and disability under 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"); the Louisiana Employment Discrimination Law, La. R.S. 23:302; and the New Orleans Code of Ordinances, Chapter 86. Record Doc. No. 18 (Amended Complaint at 1). This matter was referred to a United States Magistrate Judge for all proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c) upon written consent of all parties. Record Doc. No. 24.

Two of defendants' motions for partial summary judgment remain pending. Record Doc. Nos. 28, 31. Plaintiff filed opposition memoranda after being granted an extension of time to do so. Record Doc. Nos. 49, 50. Defendants then filed replies. Record Doc. Nos. 55, 56. Because defendants addressed plaintiff's Section 1981 claims for the first time in their replies, I provided plaintiff an opportunity to oppose those arguments in a supplemental memorandum and to

address certain ambiguities in her complaint. Record Doc. No. 59. Plaintiff filed the supplemental memorandum. Record Doc. No. 60. I subsequently dismissed as moot in part and without prejudice in part defendants' motion for summary judgment as to plaintiff's claims against the individual defendants, Record Doc. No. 29, <u>except</u> plaintiff's Section 1981 claims, which I reserved to address in connection with the Title VII motion. Record Doc. No. 62. Plaintiff also voluntarily dismissed all claims under the New Orleans Municipal Code as to all parties. Record Doc. No. 60 at p. 17.

Having considered the complaint, the record, the submissions of the parties and the applicable law, IT IS ORDERED that the motions are GRANTED for the following reasons.

I.    UNDISPUTED MATERIAL FACTS

The following material facts are accepted as undisputed solely for purposes of the pending motions for summary judgment.

Ricks, an African-American woman, was hired at Friends on June 1, 2016, as an Outreach Coordinator in the development department with a salary of $36,000 per year. Record Doc. Nos. 50-3 at p. 1, ¶ 3; 50-4 at p. 13. On or around August 1, 2017, Marcel McGee ("McGee"), an African-American man, was hired as Director of Development. Record Doc. Nos. 50-3 at p. 2, ¶ 8; 50-7 at p. 10.The development department was subsequently reorganized and restructured. Record Doc. Nos. 50-3 at p. 7, ¶ 42; 50-4 at p. 19. Friends had an Employee Handbook that contained reporting policies for harassment and discrimination, among other things. Record Doc. No. 50-10 at pp. 12–13.

On September 15, 2017, Ricks emailed Royster requesting a meeting to discuss "some [Human Resources] related questions." Record Doc. No. 50-11 at p. 1. They scheduled their meeting to take place at 8:30 a.m. on September 20, 2017 at CC's Coffee shop on Esplanade Avenue. Id. at pp. 1–2. On September 19, 2017, the day before their scheduled meeting, Ricks cancelled the meeting. Id. at p. 3.

On October 31, 2017, Ricks emailed Royster outlining a complaint she had against McGee. Record Doc. No. 50-12 at p. 1. Ricks met with Royster on November 1, 2017. Record Doc. Nos. 50-3 at p. 5, ¶ 26. At Royster's request, Ricks wrote down her complaint, and Royster sent an email with her complaint to Utterback. Record Doc. No. 50-12 at pp. 1–2.

On November 2, 2017, Royster met with McGee, and had him draft a written response. Record Doc. No. 50-13 at pp. 3–4. Utterback and Royster then met with McGee. Id. Utterback and Royster interviewed Ricks's colleagues in the development department, including KaTrina Griffin ("Griffin"), an African-American woman. Record Doc. Nos. 50-3 at p. 6, ¶ 31; 50-5 at p. 17; 50-7 at p. 12; 50-13 at p. 4. Later that day, Ricks met with Royster and Utterback, who informed plaintiff about the results of their investigation. Record Doc. Nos. 50-3 at p. 6, ¶¶ 32–36; 50-7 at p. 15; 50-8 at p. 21.

On November 3, 2017, Ricks emailed the Human Resources Committee of Friends's Board of Directors ("Human Resources Committee") and filed a formal complaint against McGee. Record Doc. No. 50-3 at p.7, ¶ 38; 50-18. On Monday, November 6 or Tuesday, November 7, 2017, Ricks met with the Human Resources Committee, which was comprised of

Doug Hammel, Deb Harkins and Judge Sidney Cates. Id. The Human Resources Committee, in the course of their investigation, again interviewed McGee. Record Doc. No. 50-9 at pp. 6–7.

As to her ADA claims, Ricks depends upon diagnoses of post-traumatic stress and bipolar disorders, including generalized anxiety, depression, panic attacks and sleeplessness. Record Doc. No. 50-4 at pp. 25–29.

Ricks tendered her resignation on November 16, 2017. Record Doc. No. 31-9 at p. 53. On November 17, 2017, the Human Resources Committee notified Ricks in writing that the committee was "unable to substantiate the alleged violations of [Friends's] Equal Opportunity Employment policy . . . and accordingly determined that no remedial action would be taken at this time." Record Doc. No. 31-9 at p. 49. Shortly after her departure from Friends on November 16, 2017, Ricks began working at Voice of the Experienced or Voters Organized To Educate ("Voters") at an increased salary of $45,000 per year and retained her position there until June 2018. Record Doc. No. 50-4 at p. 8.

II.    ANALYSIS

A.    Legal Standards for Summary Judgment Motion

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Rule 56, as revised effective December 1, 2010, establishes procedures for supporting factual positions:

(1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2)  Objection That a Fact Is Not Supported by Admissible Evidence.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3)  Materials Not Cited.  The court need consider only the cited materials, but it may consider other materials in the record.

(4)  Affidavits or Declarations.  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Thus, the moving party bears the initial burden of identifying those materials in the record that it believes demonstrate the absence of a genuinely disputed material fact, but it is not required to negate elements of the nonmoving party's case.  Capitol Indem. Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to [a particular material] fact."  Advisory Committee Notes to 2010 Amendments to Rule 56 (quoted in Federal Civil Judicial Procedure and Rules, at p. 229 (Thomson Reuters 2019 ed.)

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  No genuine

dispute of material fact exists if a rational trier of fact could not find for the nonmoving party based on the evidence presented.  Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712 (5th Cir. 1994).

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements of its claim.  Id. (citing Celotex, 477 U.S. at 321–23); accord U.S. ex rel. Patton v. Shaw Servs., L.L.C., 418 F. App'x 366, 371 (5th Cir. 2011).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."  Celotex, 477 U.S. at 323; accord U.S. ex rel. Patton, 418 F. App'x at 371.

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."  Edwards v. Your Credit, Inc., 148 F.3d 427, 432 (5th Cir. 1998); accord Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005).  "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."  Badon v. R J R Nabisco Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted) (emphasis in original).  "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'"  Nat'l Ass'n of Gov't Employees, 40 F.3d at 713 (quoting Anderson, 477 U.S. at 249).

"Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential

fact that it could not support a judgment in favor of the nonmovant." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation omitted) (emphasis in original); <u>accord</u> <u>Duron v. Albertson's LLC</u>, 560 F.3d 288, 291 (5th Cir. 2009).

B.      <u>Title VII Claims</u>

The court has previously dismissed all Title VII claims against the individual defendants, Record Doc. No. 61, leaving Friends as the only defendant on these claims. Ricks asserts three kinds of Title VII claims based upon her race and gender; specifically, that Friends (i) subjected her to a hostile work environment, (ii) discriminated against her in causing her termination by constructive discharge, and (iii) retaliated against her because she  complained about certain incidents during her employment and filed a formal complaint. Record Doc. No. 18 (Amended Complaint at ¶¶ 17–43).

(I)      <u>Hostile Work Environment</u>

To establish a race or gender-based hostile work environment claim under Title VII, a plaintiff must prove each of the following:

> (1) membership in a protected group; (2) harassment (3) based on a factor rendered impermissible by Title VII; (4) <u>the harassment affected a term, condition, or privilege of employment;</u> and (5) the employer knew or should have known of the harassment yet failed to address it promptly.

<u>Hernandez v. Yellow Transp., Inc.</u>, 670 F.3d 644, 654 (5th Cir. 2012) (emphasis added).  To affect a term, condition, or privilege of employment, the harassment complained of must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. <u>Hernandez</u>, 670 F.3d at 651.  To determine whether conduct is

severe or pervasive, courts look to the totality of the circumstances.  Stewart v. Miss. Transp. Com'n, 586 F.3d 321, 330 (5th Cir. 2009).

"'[W]here the harassment is allegedly committed by a supervisor with immediate or successively higher authority, the plaintiff employee needs to satisfy only the first four of the elements listed above.'"  Parker v. La. Dep't of Special Educ., 323 F. App'x 321, 325 (5th Cir. 2009) (quoting Celestine v. Petroleos de Venezuela SA, 266 F.3d 343, 353 (5th Cir. 2001)).  The employer defendant will then have the opportunity to prove its affirmative Ellerth/Faragher defense, derived from Faragher v. Boca Raton, 524 U.S. 775 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998).

The Ellerth/Faragher defense provides that when, as here, the harasser is plaintiff's supervisor, rather than a mere coworker, defendants may be subject to liability unless they can show that (1) the employer exercised reasonable care to prevent and correct any harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. Vance v. Ball State Univ., 570 U.S. 421, 424 (2013) (citing Faragher, 524 U.S. at 807 (1998);  Burlington Industries, Inc. v. Ellerth, 524 U.S. at 765).

A supervisor, for purposes of the employer's vicarious liability under Title VII, is one who "is empowered by the employer to take tangible employment actions against the [plaintiff]." Vance, 570 U.S. at 450. Tangible employment actions are those which "effect 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"

Id. at 431. Utterback and Royster testified that McGee had such authority. Record Doc. Nos. 50-7 at pp. 10–11; 50-8 at p. 12.

In this case, it is unnecessary to address Friends's Ellerth/Faragher defense because plaintiff cannot prove an essential element of her claim as to which she bears the burden of proof at trial.

Ricks testified that the harassment about which she complains began in early August 2017 and continued until she tendered her resignation on November 16, 2017. Record Doc. No. 50-4 at pp. 16–17. As an African-American woman and thus a member of two protected classes, Ricks has satisfied her burden as to the first essential element of a hostile work environment claim. As to the second and third elements, she has produced sufficient evidence to create a triable issue of disputed fact as to whether some harassment seemingly based on race[1] or gender occurred. In particular, Ricks testified that McGee called her "black woman . . . [on m]ultiple occasions . . . during each of [their] interactions . . . [at least] . . . more than fifteen times . . . [from] when he started . . . until [she] tendered [her] resignation." Record Doc. No. 50-

---

[1] In the context of age-based discrimination, the Fifth Circuit has held that "discrimination is less likely when the supervisor is in the same protected class as plaintiff." McMichael v. Transocean Offshore Deepwater Drilling, Inc., 2019 WL 3798211, at *8 (5th Cir. Aug. 13, 2019) (citing Kelly v. Costco Wholesale Corp., 632 F.App'x 779, 783 (5th Cir. 2015) ("[The plaintiff's] membership in the same protected class as [the supervisor] bolsters the inference that age discrimination was not the reason for his termination.") and Brown v. CSC Logic, Inc., 82 F.3d 651, 658 (5th Cir. 1996), abrogated on other grounds by Reeves, 530 U.S. at 134). Other courts in this circuit have extended the reasoning in Kelly and McMichael to cases involving discrimination based on race. Donald v. Plus4 Credit Union, 2017 WL 3235659, at *9 (S.D. Tex. Jul. 31, 2017) ("Here, [CEO] is of the same protected class as [plaintiff] and was the same person who hired and fired her, generating a rebuttable inference that racial discrimination was not the employer's motivating factor.") These cases indicate that, while the fact that plaintiff and her supervisor, McGee, were both African-Americans and thus in the same protected class makes racial discrimination less likely, such an inference does not per se preclude plaintiff from demonstrating a triable issue of racial discrimination.

4 at pp. 16–17.  When asked for the context, Ricks testified that McGee would use the term "in phrasing, like, 'just like a black woman to make my life difficult' . . . 'typical black woman.'" Id. at p. 17. She testified that McGee also called Griffin "black woman." Id. at p. 18.

Ricks testified that McGee, himself an African-American, also expressed his opinion about black people dating outside of their race, and "explain[ed] why black men can date outside of their race because it's a social construct that prevents them from doing so, whereas, black women who date outside of their race are selling out." Record Doc. No. 50-4 at p. 37. Ricks testified that she was not part of this conversation but overheard it, and thinks that Griffin, another African-American woman, was also a part of it. Id.  Ricks testified that McGee also made comments about her hair. Id. at p. 21. McGee allegedly said at a team luncheon that Ricks may have to change her hairstyle if the employee handbook said that "natural hair" was not allowed,[2] and he made a passing comment that "women . . . with natural hair . . . hav[e] more attitude." Id. at p. 25.

Ricks also testified that "we had a new couch delivered [in the hallway] and . . . Jorge Fuentes came into the office [and] . . . made a statement where . . . people are going to be [having sex] on the couches and you're going to have to be careful about all those stains and laughed at that joke . . . ." Id. at p. 21. Ricks testified that McGee was present for the conversation, but left when Fuentes made the joke. Id. Then, when Ricks talked to McGee about the incident, she testified that "he pretty much told me that I needed to hold myself with more respect and decorum and that . . . I shouldn't be acting like that . . . [a]nd I asked him to . . . go and talk to

---

[2] The handbook contains no such statement.

-10-

Jorge and do what you need to do to document this . . . and take care of it. . . . And he . . . never did anything about it." Id. at pp. 21–22.

As to the fourth required element, however, Ricks cannot bear her burden to prove that the incidents affected a term, condition or privilege of her employment.

> For harassment to affect a term, condition or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." To determine whether harassment is so severe or pervasive that it alters the conditions of the plaintiff's employment, this Court considers a number of factors: "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating (or whether it is a mere offensive utterance), and whether it unreasonably interferes with the victim's work performance."

Buisson v. Bd. of Supervisors, 592 F. App'x 237, 245 (5th Cir. 2014) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)(emphasis added)).

Except for possibly the "black woman" comments, these incidents involve isolated, infrequent comments and stray remarks. Fifth Circuit precedent establishes that evidence of stray remarks does not establish harassment that was so severe or pervasive that it altered the conditions of Ricks's employment. McGee's remarks and discussions with Ricks, while offensive and annoying, are not evidence sufficient to sustain an actionable claim of race or gender-based hostile work environment. Buisson v. Bd. of Sup'rs of La. Cmty. and Tech. College Sys., 592 F. App'x 237, 245 (5th Cir. 2014) (citing Lauderdale v. Tex. Dep't of Criminal Justice, 512 F.3d 157, 163 (5th Cir. 2007)) ("Title VII . . . is not a 'general civility code,' and 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory charges in the 'terms and conditions of employment.'") (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998))).

Even the "black woman" comments, which Ricks testified were frequent but occurred only during the three-and-one-half month period during which she and McGee were both employed at Friends, Record Doc. No. 50-4 at pp. 16–17, "pale in comparison, both in severity and frequency, to the kinds of verbal harassment that the Fifth Circuit and other circuits have held would support a Title VII, hostile-work-environment claim." Buisson, 592 F. App'x at 245 (5th Cir. 2014) (comparing Walker v. Thompson, 214 F.3d 615, 619–22 (5th Cir. 2000) (holding that a hostile work environment claim survived summary judgment where evidence demonstrated years of inflammatory racial epithets, including "nigger" and "little black monkey"); Daniels v. Essex Group, Inc., 937 F.2d 1264, 1266 (7th Cir. 1991) (holding that the plaintiff survived summary judgment where the plaintiff was subjected to "nigger jokes" for a ten-year period and the plaintiff's work-station was adorned with "a human-sized dummy with a black head"); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 182 (4th Cir. 2001) (reversing summary judgment where the plaintiff suffered "incessant racial slurs" including "nigger" and "dumb monkey"), with Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 348 (5th Cir. 2007) (finding that the evidence was insufficient to establish a hostile-work-environment claim where a supervisor's comments about inner-city "ghetto children" ceased upon plaintiff's request, and the supervisor's other arguably racially offensive comments were "isolated incidents")); see also Kumar v. Shinseki, 495 Fed. Appx. 541, 543 (5th Cir. 2012) (criticism in the workplace and threats to employee's job did not constitute actionable harassment).

McGee's comments were rude and uncivil, but there is no indication that they or he were physically threatening. Thus, Ricks has not produced evidence that this alleged conduct was so

severe, physically threatening or humiliating to interfere unreasonably with her work. "Based on the totality of the circumstances, the combination of alleged acts does not constitute a hostile work environment because [plaintiff] has not shown that the acts were 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" Minnis, 620 F. App'x at 221. Accordingly, Friends is entitled to summary judgment in its favor as a matter of law on Ricks's hostile work environment claim because she fails to create a triable issue of fact as to an essential element of this cause of action.

(ii)    Discriminatory Termination/Constructive Discharge Claim

In an employment discrimination case under Title VII alleging termination, including by constructive discharge, plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). A plaintiff establishes a prima facie case of race- or sex-based discrimination by demonstrating that she

> "(1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside of the protected class, or, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably."

Standley v. Rogers, 2017 WL 958318, at *1 (5th Cir. Mar. 10, 2017) (quoting Bryan v. McKinsey & Co., 375 F.3d 358, 360 (5th Cir. 2004)) (emphasis added); accord Buckhanan v. Shinseki, 665 F. App'x 343, 349 (5th Cir. 2016) (citing Haire v. Bd. of Supervisors, 719 F.3d 356, 363 (5th Cir. 2013)). If plaintiff establishes a prima facie case, the burden of production shifts to the defendant to present a legitimate, non-discriminatory reason for the challenged employment action. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993). "If the defendant

meets its burden, the presumption of discrimination created by the plaintiff's prima facie case disappears and the plaintiff must meet [his] ultimate burden of persuasion on the issue of intentional discrimination." Machinchick v. PB Power, Inc., 398 F.3d 345, 350 (5th Cir. 2005).

Ricks cannot establish a prima facie case of discrimination because she has insufficient proof to establish that she was subject to an adverse employment action. Adverse employment actions in the context of discrimination claims "consist of ultimate employment decisions such as hiring, firing, demoting, promoting, granting leave, and compensating. [A]n employment action that does not affect job duties, compensation, or benefits is not an adverse employment action. . . . [A] mere inconvenience or an alteration of job responsibilities will not suffice." Thompson v. City of Waco, 764 F.3d 500, 503 (5th Cir. 2014) (quotation and citations omitted) (emphasis added).

Ricks was not terminated by Friends. She conceded in her deposition testimony that neither her salary nor her benefits changed. Record Doc. No. 50-4 at p. 20. Ricks admittedly resigned. She alleges, however, that defendants' actions resulted in her constructive discharge. "[A] resignation may still constitute an adverse employment action 'if the resignation qualifies as a constructive discharge. To prove a constructive discharge, a plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign.'" Brown v. Liberty Mut. Grp., Inc., 616 F. App'x 654, 657 (5th Cir. 2015) (quoting Brown v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir. 2001)) (emphasis added). "This is an objective standard, and what is subjectively intolerable to a particular employee may strike a court or jury as merely unpleasant." Green v. Brennan, 136 S. Ct. 1769, 1789 (2016) (Alito, J.,

concurring in the judgment) (citing Pa. State Police v. Suders, 542 U.S. 129, 141 (2004)); accord

Noack v. YMCA, 418 F. App'x 347, 352 (5th Cir. 2011) (citing Stover v. Hattiesburg Pub. Sch.

Dist., 549 F.3d 985, 991 (5th Cir. 2008); Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 481

(5th Cir. 2008)).

"Part of an employee's obligation to be reasonable is an obligation not to assume the

worst and not to jump to conclusions too fast." Dornhecker v. Malibu Grand Prix Corp., 828

F.2d 307, 310 (5th Cir. 1987) (quotation omitted); accord Brandon v. Sage Corp., 808 F.3d 266,

272 (5th Cir. 2015) (citing Aryain, 534 F.3d at 481–82). In other words, plaintiff must complain

about working conditions and give her employer a reasonable time to remedy them before she

concludes that the employer is acting deliberately to force her resignation. Hinojosa v. CCA

Props. of Am., LLC, 400 F. App'x 920, 923–24 (5th Cir. 2010); Haley v. Alliance Compressor

LLC, 391 F.3d 644, 652 (5th Cir. 2004); McKethan v. Tex. Farm Bureau, 996 F.2d 734, 741 (5th

Cir. 1993).

> In determining whether a reasonable employee would have felt compelled to
> resign, [the Fifth Circuit has] considered whether the following factors are
> present: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities;
> (4) reassignment to menial or degrading work; (5) reassignment to work under a
> younger supervisor; (6) badgering, harassment, or humiliation by the employer
> calculated to encourage the employee's resignation; or (7) offers of early
> retirement or continued employment on terms less favorable than the employee's
> former status.

Matherne v. Ruba Mgmt., 624 F. App'x 835, 841 (5th Cir. 2015) (quoting Brown, 237 F.3d at

566). "In addition, a plaintiff may be constructively discharged if the employer gives the

employee an ultimatum to quit or be fired. However, in these ultimatum cases, courts have

required something beyond the employee's subjective belief that termination was inevitable." <u>Perret v. Nationwide Mut. Ins. Co.</u>, 770 F.3d 336, 338–39 (5th Cir. 2014) (citations omitted).

"Constructive discharge is an 'aggravated' form of discrimination involving truly 'intolerable' working conditions that leave an employee no choice but to resign." <u>Green</u>, 136 S. Ct. at 1789 (Alito, J., concurring in the judgment) (quoting <u>Suders</u>, 542 U.S. at 146–47). "Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim. Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge . . . ." <u>Brown</u>, 237 F.3d at 566 (citations omitted); <u>accord</u> <u>Matherne</u>, 624 F. App'x at 841.

Ricks alleges that changes in her job duties were part of the conditions resulting in her constructive discharge. "Defendant McGee [first] began to strip [her] of her responsibilities and would assign [her] tasks to another white/Caucasian employee [Melanie Merz] . . . [and later] escalated his conduct by effectively removing all of [her] responsibilities, changing her job description and changing her job title all together." Record Doc. No. 18 (Amended Complaint at ¶¶ 26, 43). Ricks testified that after this change she "no longer handled branding outside of [Friends]. [Her] relationships with multiple . . . businesses and associations were cut. [She] no longer held events like procurement and management for the major gift events. [She] was no longer able to do . . . sponsorship duties, like strategic partnership, community partners that [she] typically handled." Record Doc. No. 50-4 at p. 20. Ricks also alleges that this was in "retaliation for her continued complaints and action to correct the harassment." <u>Id</u>. at ¶ 43. Ricks states in

her Declaration that "McGee personally disregarded my requests to keep my role as is." Record Doc. No. 50-3 at p. 7, ¶ 42.

However, on November 1, 2017, McGee emailed Ricks and included an attached description of her title change and new responsibilities. Record Doc. No. 31-9 at p. 33. On November 8, 2017, Ricks replied with apparent approval, including in her message a "thumbs-up" emoticon and the words "I can dig it." Id. Additionally, Royster, McGee, Griffin and even Ricks herself all testified that the entire development department was being reorganized and restructured. Record Doc. Nos. 50-4 at p. 19; 50-5 at p. 8; 50-6 at pp. 6–8; 50-7 at pp. 7–11; 50-8 at p. 14. Royster and Griffin testified, without evidentiary contradiction, that the discussion of reorganization began before Ricks's complaint. Record Doc. Nos. 50-5 at pp. 8–9; 50-8 at p. 14. Restructuring of the development department and the resulting changes in Ricks's job duties were not adverse employment actions because her reassigned duties were neither menial nor degrading, and no "ultimate employment decisions" of the type the law requires to meet this standard occurred. Plaintiff cannot establish a prima facie case of discrimination based on them. Ackel v. Nat'l Communs., Inc., 339 F.3d 376, 385 (5th Cir. 2003) ("Restructuring office procedures [and] clarifying job duties . . . do not constitute ultimate employment decisions"); accord Thompson, 764 F.3d at 503.

Ricks fails in her burden to produce competent summary judgment evidence of a genuine fact issue that she was constructively discharged. She has not shown that she gave her managers a reasonable opportunity to address her complaints before resigning. Friends's Employee Handbook clearly states that if an employee has "any concern" that Friends's No Harassment

Policy may have been violated, that employee is to first "discuss any concern with the Chief Financial Officer. If you are not satisfied after you speak to the Chief Financial Officer, or if you feel that you cannot speak to the Chief Financial Officer, discuss your concern with the General Manager. If you are not satisfied after you speak with the General Manager, or if you feel you cannot speak to the General Manager, speak to the Human Resources Committee of the Board of Directors." Record Doc. No. 50-10 at p. 13. As established by the undisputed evidence submitted by the parties, Ricks formally complained about her working conditions to Royster, the Chief Financial Officer, on October 31, 2019. Record Doc. No. 50-3 at p. 5, ¶ 25. She resigned approximately two weeks later, on November 16, 2019, Record Doc. No. 50-15 at pp. 1–2, <u>before</u> the Human Resources Committee notified her of the results of their investigation. <u>See</u> Record Doc. No. 31-3 at p. 45 ("[the Board gave a response] the day after I resigned"). Additionally, by her own admission Ricks contacted the EEOC through its online portal in October 2017, <u>before</u> she filed her written complaint with Royster. Record Doc. No. 50-4 at p. 15.

Ricks states in her Declaration that Utterback "threaten[ed her] employment, insist[ed] that [she] could either return to work or find employment elsewhere." Record Doc. No. 50-3 at p. 6, ¶ 35. Ricks testified in her deposition that Utterback told her that she "could get onboard and do [her] job or . . . [she was] welcome to find new employment." Record Doc. No. 50-4 at p. 39. Utterback testified that she said, "But, you know, we're going to be doing big things here. We're turning the station around. I want you to be a part of it. I want you to come back and be part of that." Record Doc. No. 50-7 at p. 16. Doug Hammel, then a member of Friends's Human

Resources Committee, testified that Ricks did not mention any threatened job loss or ultimatum during the Human Resources Committee's interview with her. Record Doc. No. 50-9 at p. 6.

In cases involving ultimatums, courts have generally found that evidence that an employee was forced to choose between resigning or being fired may be sufficient to establish a triable fact issue regarding constructive discharge. See Faruki v. Parsons S.I.P., Inc., 123 F.3d 315, 319 (5th Cir. 1997) (compelling evidence of constructive discharge when manager "told [plaintiff] that he should find another job, as the company would be unable to retain him, and that he had one week before he would be placed on indefinite unpaid leave"); Stephens v. C.I.T. Grp./Equip. Fin., Inc., 955 F.2d 1023, 1027–28 (5th Cir. 1992) (holding that employee "reasonably could have believed that his demotion was a harbinger of dismissal" where there was a demotion, continuing limitations on the employee's salary and responsibility, and a supervisor repeatedly asking him whether he was going to quit his job); Lee v. Mission Chevrolet, Ltd., 2017 WL 4784368 at *16 (W.D. Tex. Oct. 23, 2017) (finding genuine issue of material fact as to whether plaintiff was constructively discharged when he testified that he was told by his manager that either plaintiff or his girlfriend, who also worked at the company "had to resign or both would be terminated"); Caldwell v. Lazano, 689 Fed. App'x 315, 320 (5th Cir. 2017) (finding no constructive discharge when plaintiff was sent a letter by his supervisor which stated that plaintiff was going to be terminated, but asked plaintiff to provide reasons why he should not be and plaintiff failed to do so); Jones v. Blue Cross and Blue Shield of Louisiana, 2018 WL 618599, at *10 (M.D. La. Jan. 29, 2018) (finding summary judgment appropriate on constructive discharge issue where, in tendering her resignation, plaintiff "said she was resigning

'in lieu of being let go as stated in my last meeting with you'" where plaintiff's recollection of her meeting with her supervisor was "extremely vague" and the supervisor said "something about plaintiff being "let go"); <u>Ruggles v. Greco</u>, 2015 WL 1538803, at *8 (E.D. La. Apr. 7, 2015) (finding constructive discharge when plaintiff was told by employer to "either resign or be arrested"); <u>Bianchini v. Vance</u>, 2018 WL 1801431, at *3 (S.D. Miss. Apr. 16, 2018) (finding case was more akin to constructive discharge when employer gave plaintiff "an ultimatum to resign or be terminated").

The evidence in this case is like the circumstances in <u>Jones</u> and <u>Caldwell</u> and does not rise to the level of ultimatum noted in the other cases cited above. Unlike the cases in which the ultimatum was found to be a constructive discharge, no evidence suggests that Utterback explicitly threatened Ricks's continued employment or termination. Instead, particularly in the context of a meeting during which Ricks was complaining about the conditions of her employment, Utterback's statement does not contain a threat of termination. Ricks's mere subjective belief that this statement inherently contained such a threat, when it does not on its face and in full context, is insufficient to defeat summary judgment on this issue.

Ricks has proffered insufficient evidence that a reasonable employee would have felt compelled to resign in these circumstances. She was not demoted or reassigned to menial or degrading work or under a younger supervisor. While her job responsibilities changed, the evidence establishes that Friends was formally and openly restructuring the development department, a fact Ricks <u>herself</u> expressly acknowledges. Record Doc. No. 50-4 at p. 19. There is no evidence that any alleged harassing behavior from McGee was intended to encourage or

should reasonably have prompted her resignation. Griffin testified that McGee referred to her and other African-American women as "black woman" and even referred to himself as "black man." Record Doc. No. 50-5 at pp. 11–15, 20. Griffin testified that she viewed McGee's statements as "just . . . how he spoke in general." Id. at 20. There were no offers of early retirement or continued employment on terms less favorable than Ricks's former status. As established by the evidence, Ricks participated in and even approved her change in title and job duties. Record Doc. Nos. 31-6 at p. 8; 31-9 at pp. 31–33.

Ricks suffered no reduction in salary. While she admitted in her deposition testimony that none of Friends's actions resulted in any actual reduction in her compensation or benefits, Record Doc. No. 50-4 at p. 20, she asserts that she was not given a raise in pay that she requested from McGee. Specifically, she testified that she "was told [by McGee] that I would get a raise because that's what I asked for. . . . I remember I went to payroll because it wasn't effective that past check and it should have been." Id. at p. 23. She did not recall when she asked McGee for the raise or when McGee told her she would get it, although she recalled that it was going to be a $3,000 raise in annual salary. Id. at pp. 23–24. Asked when she expected to receive the pay raise, she testified vaguely, "Maybe November [2017] . . . that first check, maybe" around November 1. Id. at p. 24. She stated that she did not remember ever getting the raise. Id.

Ricks acknowledged that when she went to the payroll department in early November to inquire about the raise not being effective, id. at p. 23, she was told by Royster "that he had received no paperwork to initiate my raise and that I wasn't going to see anything until, like, Marcel [McGee] had made a formal request and it passed through all the things that it needed

to pass through." Id. at p. 24. She denied ever actually receiving the raise. Id. However, the undisputed evidence in the record demonstrates that an email exchange among McGee, Utterback and Royster "to finalize and implement" the $3,000 pay raise, approved for Ricks expressly by name and position, was processed and formally approved November 7–10, 2017, before her resignation six days later. Record Doc. No. 50-16 at pp. 1–2. Thus, this cannot be characterized as an adverse employment action when defendants approved the raise before she resigned and close in time to when she thought she would receive it, and her resignation six days later prevented her from actually pocketing it.

In the absence of a constructive discharge or other negative ultimate employment decision, plaintiff cannot show that she was subject to an adverse employment action and cannot establish a prima facie case of intentional race or sex discrimination.

(iii)    Retaliation Claim

As to her retaliation claim, "Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee . . . because [s]he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'"  Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 58 (2006) (quoting 42 U.S.C. § 2000e-3(a)); accord McCoy v. City of Shreveport, 492 F.3d 551, 561 n.28 (5th Cir. 2007).

> To prove retaliation, plaintiff bears the initial burden to produce evidence:
> (1) that [she] participated in an activity protected by Title VII, (2) that [her] employer took an adverse employment action against [her], and (3) that there is a causal connection between the adverse employment action and the protected activity.  This establishes the employee's prima facie case, and gives rise to an inference of retaliation.  The burden then shifts to the employer to articulate a

legitimate non-retaliatory reason for the adverse employment action. Once the employer articulates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to demonstrate that the employer's [stated] reason is actually a pretext for retaliation. In order to demonstrate pretext sufficient to defeat a motion for summary judgment, an employee must produce evidence that could lead a reasonable fact-finder to conclude that the adverse [employment] action would not have occurred "but for" the employee's decision to engage in an activity protected by Title VII.

Alkhawaldeh v. Dow Chem. Co., 851 F.3d 422, 427 (5th Cir. 2017) (quotations and citations omitted) (emphasis added).

For the same reasons discussed above, Ricks cannot establish actionable retaliation because she cannot sustain her burden to prove that Friends took an adverse employment against her causally connected to any protected activity. The evidence in the record is insufficient to create a triable issue that a reasonable employee in Ricks's position would have felt compelled to resign. Thus, plaintiff cannot establish that she suffered any adverse employment action, including constructive discharge. Id. In the absence of an adverse employment action, Ricks cannot establish a case of retaliation.

No genuine issue of material fact is presented as to an essential element of plaintiff's Title VII race and gender discrimination and retaliation claims. Her evidence is insufficient to support her burden of proving at trial that she was subjected to an adverse employment action, was constructively discharged or was subjected to a hostile work environment as those terms are defined as a matter of law. Thus, Friends is entitled to summary judgment on the Title VII claims.

C.    <u>Americans with Disabilities Act Claims</u>

Like the Title VII claims, Friends is the only defendant remaining on the ADA claims. Record Doc. No. 61. Ricks asserts two ADA causes of action; specifically, that Friends (1) discriminated against her based on her disability and (2) retaliated against her for asserting claims of disability discrimination. Record Doc. No. 18 (Amended Complaint at ¶¶ 44–47). The ADA broadly provides that "[n]o covered entity shall discriminate against a <u>qualified</u> individual <u>on the basis of disability</u> . . . ."  42 U. S. C. § 12112(a) (emphasis added).  Although their "methods of proof are related," some kinds of disability discrimination claims are "distinct" from others. <u>E.E.O.C. v. LHC Group, Inc.</u>, 773 F.3d 688, 703 n. 6 (5th Cir. 2014).

Considering the allegations in her amended complaint, as expressly explained in her memorandum in opposition to defendants' ADA motion, plaintiff's ADA discrimination claim in this case must properly be characterized as a discriminatory termination action. <u>Id.</u> Her amended complaint alleges that defendant both discriminated against and retaliated against her when it "constructively discharged" her by making her working conditions, including defendant's failure to accommodate her request to be moved to another location, "so onerous, abusive and intolerable" that her "choice to resign was void of choice or free will."  Record Doc. No. 18 at p. 7, ¶ 48. In her opposition memorandum, plaintiff unambiguously states  that "<u>[t]here can be no dispute</u> that claims of discrimination and retaliation under [the] ADA are governed by the <u>McDonnell Douglas</u> burden-shifting framework, . . ." under which "plaintiff bears 'the initial burden of establishing a prima facie case of . . . discrimination.'" Record Doc. No. 49 at p. 4 (emphasis added). In addition, Ricks makes plain, citing <u>LHC Group</u>, Record Doc. No. 49 at p.

5, that her arguments and evidence concerning Friends's failure to provide a reasonable accommodation in the form of temporary transfer to its satellite office pertain exclusively to the second prong of her discriminatory termination action prima facie case, i.e., that she was "qualified" because the requested accommodation would have allowed her to perform the essential functions of her job. LHC, 773 F.3d at 703. Thus, plaintiff must present evidence sufficient to create a triable fact dispute concerning all ADA discriminatory termination prima facie case requirements.

"In a discriminatory-termination action under the ADA, the employee may either present direct evidence that she was discriminated against because of her disability or alternatively proceed under the burden-shifting analysis first articulated in McDonnell Douglas," which "first requires the [plaintiff] to establish a prima facie case of discrimination." E.E.O.C. v. LHC Group, Inc., 773 F.3d 688, 694 (5th Cir. 2014). As clearly stated in her opposition memorandum, Ricks expressly proceeds under the latter approach.

In LHC Group, the Fifth Circuit painstakingly evaluated the "splinter into three distinct lines" of cases in its decisions and clearly concluded: "'To establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that [s]he has a disability; (2) that [s]he was qualified for the job; [and] (3) that [s]he was subject to an adverse employment decision on account of [her] disability.'" LHC, 773 F.3d at 695–697 (quoting Zenor v. El Paso Healthcare Sys., Ltd., 176 F.3d 847, 853 (5th Cir. 1999)) (emphasis added).

As to the first component, a disability is

"(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or © being

> regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life
> activities include "caring for oneself, performing manual tasks, seeing, hearing,
> eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning,
> reading, concentrating, thinking, communicating, and working." 42 U.S.C. §
> 12102(2)(A).

Kemp v. Holder, 610 F.3d 231, 235 (5th Cir. 2010) (quoting 42 U.S.C. §§ 12102(1),

12102(2)(A)).

As to the second component, "[a] plaintiff can establish that [s]he is 'qualified' by

showing that 'either (1) [she] could perform the essential functions of the job in spite of [her]

disability,' or '(2) that a reasonable accommodation of [her] disability would have enabled [her]

to perform the essential functions of the job.'" Moss, 851 F.3d at 417 (quoting LHC Group, 773

F.3d at 697).

As to plaintiff's ADA retaliation claim, Ricks must establish a prima facie case "by

showing that (1) [s]he engaged in an activity protected by the ADA, (2) [s]he suffered an adverse

employment action, and (3) there is a causal connection between the protected act and the

adverse action." Weed v. Sidewinder Drilling, Inc., 2017 WL 1164294, at *8 (S.D. Tex. Mar.

29, 2017) (internal citations omitted) (emphasis added); accord DeBlanc v. St. Tammany Par.

Sch. Bd., 640 F. App'x 308, 312 (5th Cir. 2016) (quoting Seaman v. CSPH, Inc., 179 F.3d 297,

301 (5th Cir. 1999)).

Significantly, as to both ADA claims, plaintiff must establish as part of her prima facie

case that she suffered an "adverse employment action." For purposes of ADA claims, the Fifth

Circuit has adopted the same definition of "adverse employment action" as applies in Title VII

claims; i.e., that adverse employment actions consist only of "ultimate employment decisions,"

such as hiring, granting leave, discharging, promoting or compensating. <u>McKay v. Johanns</u>, 265 F. App'x 267, 268–69 (5th Cir. 2008); <u>Willis v. San Antonio ISD</u>, 2017 WL 3470944, at *7 (W.D. Tex. Aug. 11, 2017); <u>Tran v. Pflugerville Independent School District</u>, 2014 WL 122160774, at *5 (W.D. Tex. May 23, 2014), <u>report and recommendation adopted sub nom.</u>, 2014 WL 12160775 (W.D. Tex. June 17, 2014).

The record establishes triable issues of material fact concerning several components of the prima facie case of plaintiff's ADA claims. For example, material fact disputes exist as to whether Ricks actually has a disability that qualifies as "a physical or mental impairment that substantially limits one or more major life activities . . . [which] include caring for oneself, . . . , sleeping, . . . and working." 42 U.S.C. §§ 12102(1)(A) and (2)(A). Courts have found that mental illnesses such as the bipolar and post-traumatic stress disorders alleged by Ricks <u>may</u> qualify as impairments under the ADA.  <u>Garner v. Chevron Phillips Chemical Co., L.P.</u>, 834 F. Supp.2d 528, 539 (S.D. Tex. Nov. 29, 2011) (citing ADA Amendments Act of 2008, Sec. 4, § 3(4)(D), 122 Stat. 3553, 3555; 29 C.F.R. § 1630.2(j)(5)); <u>Zamora v. GC Servs., LP</u>, 2018 WL 1937088, at *4–*5 (W.D. Tex. Apr. 24, 2018) (citing 29 C.F.R. § 1630.2(j)(3)(iii)).  "Merely having an impairment, however, does not make one disabled for purposes of the ADA. Plaintiffs also need to demonstrate that the impairment substantially limits a major life activity." <u>E.E.O.C. v. Chevron Phillips Chem. Co., L.P.</u>, 570 F.3d 606, 614–15 (5th Cir. 2009) (citing <u>Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 195 (2002) (citing 42 U.S.C. § 12102(2)(A) (1994))). "To be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform, or to be significantly restricted in the ability to

perform it." Chevron Phillips, 570 F.3d 606, 614–15 (5th Cir. 2009) (citing 29 C.F.R. § 1630.2(j)). The phrase "substantially limits . . . is not meant to be a demanding standard." 29 C.F.R. §§ 1630.2(j)(1)(I), (iii).

On one hand, plaintiff has produced evidence that her mental issues, when they are triggered or active, may substantially limit major life activities, such as caring for herself, driving a car, going to the grocery store, shopping or sleeping. Record Doc. No. 50-4 at pp. 25–30. On the other hand, the record contains ample evidence that Ricks was able to work, communicate and regularly perform major life activities.

Similarly, the evidence presents material fact disputes as to whether (1) her disability was known to her employer; (2) the requested accommodation was reasonable; (3) Ricks requested the accommodation because of a medical disability; and (4) the breakdown in the interactive process was "traceable to the employee" or Friends "fail[ed] to engage in the interactive process." See, e.g., Record Doc. Nos. 50-6 at p. 9;  50-7 at p. 10; 50-8 at p. 11 (Royster and Utterback deny having knowledge of Ricks's alleged disability); Record Doc. Nos. 50-4 at p. 42; 50-7 at p. 15; 50-7 at pp. 15–16 (Ricks testifies that she told defendants about her mental conditions, requested to work out of Friends's satellite office and told defendants that she needed the accommodation for a few weeks while medication for her mental conditions took effect).

However, both of Ricks's ADA claims – for discriminatory termination and retaliation – require that Ricks must first establish that she suffered an adverse employment action constituting an ultimate employment decision as part of the burden she bears to prove a prima facie case of discrimination or retaliation under the ADA. For the same reasons discussed above,

no such adverse employment action occurred as a matter of law. In addition, plaintiff provides no evidence to support her claims that any of Friends's actions were on account of her alleged disability. Even in her own deposition testimony and declaration, Ricks does not state that she suffered any adverse employment action because of her disability. The evidence in the record is insufficient for a finding that a reasonable employee in Ricks's position would have felt compelled to resign. Thus, plaintiff cannot establish that she suffered any adverse employment action, including constructive discharge. Id. In the absence of an adverse employment action, Ricks cannot meet her burden of proof to make a case of termination discrimination or retaliation under the ADA.

For all of the foregoing reasons, Friends is entitled to summary judgment on plaintiff's disability discrimination and retaliation claims under the Americans with Disabilities Act as a matter of law, and those claims must be dismissed.

D.     Louisiana Employment Discrimination Law Claims

Ricks also alleges race, sex and disability discrimination and retaliation under the Louisiana Employment Discrimination Law, La. Rev. Stat. § 23:2301 et seq., again with Friends as the only remaining defendant. Record Doc. No. 61. Courts have consistently held that claims brought under Title VII, the ADA and the Louisiana Employment Discrimination Law are analyzed under the same standard. Turner, 675 F.3d at 891 n.2 (citing Lawrence v. Univ. of Tex. Med. Branch, 163 F.3d 309, 311 (5th Cir. 1999); Knapper v. Hibernia Nat'l Bank, 49 So. 3d 898, 902 n.11 (La. App. 4th Cir. 2010)); Doe v. Merritt Hospitality, LLC, 353 F.Supp. 3d 472, 481 (E.D. La. Dec. 18, 2018).

For the same reasons discussed above, plaintiff cannot satisfy her burden of proving race, sex and disability discrimination and retaliation because she cannot establish an adverse employment action as a matter of law. Accordingly, Ricks's state law claims must be dismissed. Minnis v. Bd. of Supervisors, 55 F. Supp. 3d 864, 884–85 (M.D. La. 2014), aff'd, 620 F. App'x 215 (5th Cir. 2015) (citing Wyerick v. Bayou Steel Corp., 887 F.2d 1271, 1274 (5th Cir. 1989); Smith v. Amedisys, Inc., 298 F.3d 434, 448 (5th Cir. 2002); King v. Phelps Dunbar, L.L.P., 743 So. 2d 181, 187 (La. 1999) (citing Bustamento v. Tucker, 607 So. 2d 532, 538, n.6 (La. 1992)).

D.    Section 1981 Claims

Plaintiff's Section 1981 claims against all three defendants remain in the case. Record Doc. No. 61. In her cause of action under 42 U.S.C. § 1981, plaintiff alleges that she is "a member of the Black and/or African-American race [who] was discriminated against by Defendants because of her race . . . and . . . also claims unlawful retaliation . . . for her opposition to Defendants' unlawful employment practices." Record Doc. No. 18 at p. 9, ¶ 62.

Courts recognize Section 1981 claims alleging racial discrimination and retaliation in the employment contract context, including such claims asserted against individuals. See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 373 (2004) (racially hostile work environment); Felton, 315 F.3d at 483 (racial harassment); Foley v. University of Houston System, 355 F.3d 333, 339 (5th Cir. 2003)(retaliation)."Claims for race discrimination under Title VII . . . and Section 1981 are generally analyzed under the same Title VII framework." Wallace v. Seton Family of Hosps., 2019 WL 2484692, at *3 (5th Cir. June 13, 2019) (citing Jackson v. Watkins,

619 F.3d 463, 466 (5th Cir. 2010)) (analyzing plaintiff's Title VII and 42 U.S.C. § 1981 using the same burden-shifting framework) (emphasis added)).

Because Section 1981 claims are analyzed under the same framework as Title VII race discrimination and retaliation claims, plaintiff must initially establish a prima facie case of discrimination and retaliation to meet her initial burden, including adverse employment action. Wallace, 2019 WL 2484692, at *4. For the reasons more fully set out above, plaintiff has not shown that she suffered an adverse employment action, an essential element of a prima facie case. For that reason, she cannot prevail on her Section 1981 claims, and her claims against Royster, Utterback and Friends must be dismissed.

Plaintiff argues that "because "[d]efendants . . . expressly failed to timely request summary judgement (sic) as to [plaintiff's] cause of action under Section 1981 [, defendants] . . . have thereby waived those issues." Record Doc. No. 60 at p. 3. Defendants did not mention plaintiff''s Section 1981 claim in their original motion papers, asserting arguments as to Section 1981 only when they later filed their reply memoranda. Record Doc. Nos. 54, 55, 56. The deadline for filing pretrial motions was in time to permit notice of submission under Local Rule 7.2 by July 8, 2019. Record Doc. No. 25 at p. 1. Defendants timely filed their original motion papers before this deadline. However, their replies were filed on July 9, 2019, one day after the submission deadline.

Where – as here – the court has entered a scheduling order setting a deadline for filing pre-trial motions, the schedule "may be modified only for good cause <u>and</u> with the judge's consent." Fed. R. Civ. P. 16(b)(4) (emphasis added). "In determining whether the movant has

met its burden under Rule 16(b)(4), the court considers four factors: (1) the party's explanation; (2) the importance of the requested relief; (3) potential prejudice in granting the relief; and (4) the availability of a continuance to cure such prejudice." <u>Choice Hotels Int'l v. Goldmark Hospitality, LLC</u>, 2014 WL 80722, at *2 (N.D. Tex. Jan. 9, 2014) (quotation omitted)(citing <u>S & W Enters., LLC v. SouthTrust Bank of Ala., NA</u>, 315 F.3d 533, 536 (5ᵗʰ Cir. 2003)); <u>accord Borden v. United States,</u> 537 F. App'x 570, 574 (5th Cir. 2013)(citing <u>Reliance Ins. Co. V. La. Land & Expl. Co.</u>, 110 F.3d 253, 257 (5th Cir. 1997)).

Weighing these factors, I find that good cause has been established in these circumstances. The explanation for defendants' failure to assert Section 1981 arguments in their original motions appears to be oversight. This is not a persuasive explanation and weighs against allowing the late assertion of their Section 1981 arguments. However, all remaining factors favor permitting it. The Section 1981 arguments asserted one day late are important. A ruling on plaintiff's Section 1981 claims will affect whether the parties will be spared or exposed to incurring the substantial time, effort and cost of preparing for and conducting a trial. No prejudice occurs in permitting the one-day late assertion of arguments relating to the Section 1981 claims. The analytical and evidentiary framework for evaluating the Section 1981 claims is the same as what was previously and timely briefed in connection with the similar Title VII claims. The court interpreted defendants' arguments in their replies as supplementing their original motions for summary judgment and provided plaintiff with a full opportunity to respond to those arguments. Record Doc. No. 59. Thus, a further continuance is unnecessary. Balancing

the Rule 16 factors establishes good cause for permitting defendants' Section 1981 arguments. I do not accept plaintiff's argument that defendants waived their summary judgment rights.

III.    <u>CONCLUSION</u>

For all the foregoing reasons, IT IS ORDERED that defendants' motions for summary judgment, Record Doc. Nos. 28 and 31, are GRANTED, and these claims are DISMISSED WITH PREJUDICE. Considering the court's prior orders, Record Doc. Nos. 61 and 62, because all claims asserted by plaintiff against all defendants have been dismissed, judgment will be separately entered.

New Orleans, Louisiana, this ____25th____ day of September, 2019.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE